IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **REGINALD J.,**[1] | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )  Civil Action No. 7:20-cv-456 |
| | ) |
| **KILOLO KIJAKAZI,**[2] | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## REPORT AND RECOMMENDATION

Plaintiff Reginald J. ("Reginald") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. § 1381-1383f. Reginald alleges that the Administrative Law Judge ("ALJ") erred by: (1) rejecting the limitation found by the consultative examiner; (2) failing to accept the consultative psychologist's opinion; and (3) failing to perform an appropriate function-by-function analysis.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 15) and **DENYING** Reginald's Motion for Summary Judgment (Dkt. 13).

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence supports

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

the Commissioner's conclusion that Reginald failed to demonstrate that he was disabled under the Act.[3] <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); <u>see</u> <u>also</u> <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (quoting <u>Craig v. Chater</u>, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports decision. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Reginald filed this claim for SSI on December 28, 2017, claiming his disability began on December 23, 2016,[4] due to physical and mental impairments. R. 44–45, 55–56, 190. Specifically, Reginald claims that a stabbing injury in his neck left him unable to speak at a

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. <u>See</u> 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[4] During his hearing, Reginald amended his disability onset date from December 31, 2016 (<u>see</u> <u>e.g.</u>, R. 55, 74, 167, 299–300) to December 23, 2016. R. 44–45.

2

normal volume, unable to breathe without difficulty, and unable to use his left arm or hand. R. 56.

The state agency denied Reginald's claim at the initial level of administrative review on August 6, 2018, and upon reconsideration on November 30, 2018. R. 55–70, 73–87, 90. On September 25, 2019, ALJ Marc Silverman held a hearing to consider Reginald's claim for SSI. R. 36–54. Reginald was represented by counsel at the hearing, which included testimony from vocational expert Christine Carrozza Slusarski. Id. On October 9, 2019, the ALJ entered his decision analyzing Reginald's claim under the familiar five-step process[5] and denying his claim for SSI benefits.[6] R. 15–28.

The ALJ found that Reginald had not engaged in substantial gainful activity since December 28, 2017. R. 17. The ALJ determined that Reginald suffered from the severe impairments of residuals of knife wound to the neck, which includes hypophonia and difficulties with the left upper extremity, post-traumatic stress disorder ("PTSD"), depressive disorder, and cannabis use disorder. Id. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 18. Likewise, the ALJ found that Reginald had no severe mental impairment. R. 18–19.

---

[5] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[6] Reginald was 31 years old on his alleged onset date and 34 years old on the date of the ALJ's opinion, making him a younger person under the Act. R. 27.

The ALJ concluded that Reginald retained the residual functional capacity ("RFC") to perform light work with additional non-exertional limitations. R. 19–20. The non-exertional limitations included that Reginald could never climb ladders, ropes, or scaffolds; never crawl; occasionally reach overhead, in front, and laterally with the non-dominant left upper extremity; occasionally handle and finger with the non-dominant left upper extremity; can engage in work requiring no more than brief and occasional verbal communication at a whisper level of only a few words at a time and no telephone communication, as a result of an inability to speak at a normal volume; can perform simple, routine tasks; can make simple work related decisions; can have no more than occasional interaction with supervisors, co-workers, and the general public; and low stress work, which is defined as routine work with no more than occasional changes in the work. Id.

The ALJ determined that Reginald had no past relevant work, but that he could perform the requirements of representative occupations such as a baker worker, conveyor line, laminator, or fruit sorter. R. 26–27. Thus, the ALJ determined that Reginald was not disabled. R. 27. Reginald appealed the ALJ's decision, and the Appeals Council denied his request for review on June 12, 2020. R. 1–6.

## ANALYSIS

Reginald alleges that the ALJ erred by rejecting the medical opinions of Dr. Humphries and Dr. Gardner and by failing to perform an appropriate function-by-function analysis.

**A. Medical History Overview**

1. Medical Treatment

On December 23, 2016, Reginald was in an altercation and stabbed in the neck. R. 44, 300, 347. Reginald had surgery for his injuries and was discharged within about a week. R. 347.

He alleges that his injury caused a speech impairment due to shortness of breath, almost total loss of use of his left arm and hand and mental health problems, including depression and PTSD. R. 20–21.

From 2017 through 2019, Reginald displayed normal breath sounds, normal speech, no respiratory distress, and 4/5 grip and strength in his left upper extremity. On January 20, 2017, Reginald visited the emergency room reporting chest pain and running out of his prescribed pain medication. R. 271. Reginald denied having any shortness of breath or a sore throat and he had normal breathing sounds and no respiratory distress. R. 271–274, 276. During a follow-up neurology consultation on January 30, 2017, Ahmet Z. Burakgazi, M.D. determined that Reginald had normal speech. R. 309. Dr. Burakgazi conducted a nerve conduction study and EMG of Reginald's muscles and the nerves in his left arm, both of which were normal. R. 309–310.

In February 2017, Reginald returned to the emergency room for chest and neck pain and a medication refill, and denied having shortness of breath. R. 261. Again, Reginald had normal speech, normal breath sounds, and no respiratory distress. R. 262–263. In June 2017, Reginald was examined by Chidinma I. Osineme, M.D., and had normal breath sounds, no respiratory distress, no wheezing, and 4/5 strength in his left arm. R. 301–303. In November 2017, less than a year after his injury, Reginald had clear lungs and breath sounds, no wheezing and no shortness of breath, normal speech, and his left arm and grip had 4/5 strength and intact sensation. R. 297–298.

On January 5, 2018, Reginald went to the emergency room for upper abdomen pain. At this visit, Reginald reported that he had no neck pain, chest pain, wheezing, numbness, weakness, shortness of breath, trouble swallowing, sore throat or speech difficulty. R. 248–249.

Reginald's examination showed a normal range of motion, no swelling, and no tenderness. R. 250. During a July 2019 examination by Erika Snyder, D.O., Reginald had a cough and congestion but no shortness of breath or wheezing, and he did not report any joint or muscle pain. R. 367–370. On August 19, 2019, Reginald denied chest pain, muscle pain or weakness, shortness of breath, dry mouth, coughing, wheezing, or difficulty breathing. R. 373–375. At this visit, Reginald also had normal thought processes, speech pattern and full affect. R. 375. Consistent with his prior examinations from 2017-2019, Reginald showed clear breathing sounds and no respiratory distress. Id.

Reginald has limited mental health records, which he asserts is due to lack of healthcare. R. 39. On February 21, 2018, Laura M. Daniels, Ph.D., at Carilion Clinic treated Reginald for anxiety and sleep problems. R. 362–364. Reginald reported daily marijuana use, watching television, and gaming at night. R. 363. Reginald was not taking Dr. Osineme's prescribed medication due to a dry mouth side effect. Id. Dr. Daniels observed that Reginald had a normal affect, was appropriately dressed and well-groomed, alert, engaged, oriented, cooperative, had intact thought processes and responded positively to the visit. R. 363–364. Dr. Daniels's treatment plan included over the counter melatonin, no television or gaming at night, and low stimulation activities like reading to improve his sleep. R. 364. On his August 19, 2019 visit to the Carilion Clinic, Reginald related PTSD, depression, anxiety, night terrors, and insomnia. R. 367, 372. After not taking his medication for a year, Dr. Snyder placed Reginald on a new medication. R. 372. Dr. Snyder reported that Reginald was alert, not in acute distress, well-nourished and developed, had normal thought processes, full affect and had a normal, tranquil mental state. R. 367–368. On his follow-up visit on August 29, 2019, Reginald denied depression, anxiety, and suicidal ideation. R. 373. David S. Gregory, M.D. similarly reported that

6

Reginald had normal thought processes, speech pattern, full affect, and a tranquil mental state. R. 375.

    2. Medical Opinions

On July 31, 2018, state agency physician Jack Hutchenson, M.D., reviewed the record and found Reginald capable of a limited range of work and therefore not disabled. R. 63–65. Dr. Hutchenson found that Reginald had 4/5 strength in his left upper extremities with a limited range of motion and 4/5 grip strength. R. 64. Dr. Hutchenson included work limitations relating to Reginald's left arm, including a limitation that he could never climb ropes or ladders and only occasionally crawl. Id. Dr. Hutcheson determined that Reginald would be limited in his speaking due to a scratchy and hypophonic voice and noted that he would be able to work in an environment that did not require frequent spoken communication. R. 65. Similarly, on November 30, 2018, state agency medial expert Robert McGuffin, M.D., reviewed Reginald's records and agreed with Dr. Hutchenson that Reginald could perform a limited range of work. R. 81–83. The ALJ found these opinions persuasive. R. 25.

On July 25, 2018, Reginald visited William Humphries, M.D., for a consultative examination. R. 347–350. Dr. Humphries observed that Reginald's voice was scratchy and soft, and that he had decreased sensation to light touch in his first two fingers on his left hand, but that he had 4/5 grip strength in his left hand and left arm strength of 4/5 in his shoulder, bicep and forearm with no significant muscle wasting. R. 348–349. Dr. Humphries described Reginald as cooperative, relatable, and able to move on and off the table using his right hand. R. 348. Reginald's test for irritated nerves in his left hand was negative. R. 349. He had no hand atrophy, no tremor, and performed fine manipulation adequately with the fingers on his left hand. Id. Similar to the state agency medical experts, Dr. Humphries found that Reginald could lift 20

pounds occasionally and 10 pounds frequently and could stand or walk six hours in an eight-hour work day. R. 350. However, Dr. Humphries ended his report by stating that Reginald had "no left-hand controls and for vocational purposes will be considered a one-armed person with minimal positioning on the left." Id. The ALJ found Dr. Humphries's opinion inconsistent and not persuasive as he did not provide any explanation for his conclusion that Reginald should be considered a "one-armed person" in lieu of the doctor's contrary findings. R. 25.

Regarding Reginald's mental health, Marvin Gardner, Jr., Ph.D., conducted a psychological evaluation on August 1, 2018. R. 354–359. Dr. Gardner observed that during the visit Reginald was friendly, responsive, cooperative, and in a pleasant mood. R. 355. Reginald reported that he had made no attempt to work since his injury. R. 355–357. Reginald reported symptoms of depression, PTSD, and anxiety but no hallucinations, no delusions and that his current mood was "alright." R. 357. Dr. Gardner conducted informal cognitive functioning tests based on Reginald's "self-perceptions." R. 358. Dr. Gardner found that Reginald had moderate impairments in his immediate recall and recent memory, only a mild impairment in his long-term memory, and no impairment of concentration, persistence or pace when attempting simple and repetitive work tasks. R. 357–358. Dr. Gardner also noted that Reginald's overall insight was good. Id.  Dr. Gardner concluded that Reginald could be absent from the workplace three or more days a month and that he is not able to deal with the usual stressors encountered in competitive work. R. 359. However, Dr. Gardner also stated that Reginald is capable of performing simple and repetitive work, that he is able to perform work activities on a consistent basis and without special or additional supervision, that he can accept instructions from supervisors, that he can complete a normal workday or workweek without interruptions resulting from his psychiatric condition, and that his low volume speech and anxiety would create a

8

moderate impairment of social interaction. Id. The ALJ found Dr. Gardner's opinion of Reginald's mental impairments not persuasive. R. 26.

On August 6, 2018, Jo McClain, Psy.D., reviewed Reginald's mental health records and noted that Reginald sought minimal mental health treatment. R. 61. Dr. McClain also reviewed Dr. Gardner's psychological consultative evaluation and found that Dr. Gardner's report relied "heavily" on Reginald's subjective report of symptoms and limitations rather than observations by Dr. Gardner and was not supported by the totality of the evidence. R. 61, 67. Dr. McClain found Reginald to have moderate limitations in some areas of mental functioning including maintaining regular attendance, working without being distracted, completing a normal workday or workweek, and the ability to set realistic goals. R. 65–67. Dr. McClain noted that Reginald would be able to maintain focus, persistence and pace to perform 2-3 step tasks with normal breaks. R. 65. Dr. McClain also noted that he had no limitations with memory or understanding and no significant limitations in his ability to make simple work-related decisions, maintain socially appropriate behavior, and be aware of normal hazards. R. 65–66. Dr. McClain determined that Reginald would be able to interact with coworkers and supervisors on an infrequent and superficial basis. R. 66.

On November 29, 2018, Joseph Leizer, Ph.D., made similar findings to Dr. McClain regarding Reginald's mental functioning finding that he only had moderate limitations and was not disabled. R. 78, 83–85. Dr. Leizer determined that Reginald would be able to maintain focus, persistence, and pace to perform 2-3 step tasks with normal breaks for the duration of a normal workday and workweek. R. 84. Dr. Leizer also found that, due to Reginald's PTSD, he would not be able to work with the public but would be able to interact with coworkers and

supervisors on an infrequent and superficial basis. Id. Dr. Leizer recommended no changes to the finding that Reginald was not disabled. R. 85.

### B. Medical Opinion Evidence

Reginald asserts that the ALJ erred in rejecting the limitations offered by Dr. Humphries and Dr. Gardner and the finding that Reginald is not disabled and can perform work. Pl.'s Br., Dkt. 14 at 7–13. Specifically, Reginald argues that the ALJ should not have rejected Dr. Humphries's conclusion that Reginald was able to use his non-dominant hand "less than occasionally." Id. at 5. Reginald also argues that the ALJ erred in rejecting the opinions of the examining consultative psychologist, Dr. Gardner, that Reginald would not be capable of maintaining regular work attendance and would not be able to tolerate the normal stress encountered in a competitive workplace. Id. at 12.

Reginald argues that the evidence in the record is consistent with Dr. Humphries's opinion. Pl.'s Br., Dkt. 14 at 10. The Commissioner counters that the ALJ followed the regulations in considering Dr. Humphries's opinion, emphasizing that under the new regulations the ALJ was not required to defer to any particular medical opinion, including a treating doctor's opinion, when formulating Reginald's RFC. D.'s Br., Dkt. 16 at 12. Essentially, Reginald is asking the court to re-weigh the medical evidence.

Reginald submitted his application in December 2017, thus, 20 C.F.R. §§ 404.1520c governs how the ALJ considered the medical opinions in this case.[7] When making an RFC assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide, however, that the ALJ "will not defer or give any specific evidentiary weight, including

---

[7] 20 C.F.R. §§ 401.1520c, 416.920c applies to claims filed on or after March 27, 2017. For claims filed before this date, the rules in § 404.1527 apply.

10

controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimants' medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. Id. "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization, and other factors such as an understanding of the disability program's policies and evidentiary requirements. Id.[8]

Here, the ALJ appropriately considered Dr. Humphries's opinion under the new regulations. R. 20. The ALJ determined that Dr. Humphries's opinion was not persuasive as Dr. Humphries made observations that were inconsistent with his conclusion that Reginald had "no use" of his left arm (R. 350). The ALJ found Dr. Humphries' conclusion that Reginald had no use of left arm unsupported by evidence in the record. R. 24. Contrary to Reginald's claim that the ALJ rejected evidence consistent with Dr. Humphries's opinion (R. 300, 308, 347–355, 363), the ALJ acknowledged this evidence in his detailed summary of the Reginald's medical

---

[8] An exception to this is when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well–supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3).

11

treatment.[9] Specifically, the ALJ noted that the totality of evidence contradicted Dr. Humphries's opinion. R. 25. For example, the ALJ noted that Reginald had a normal musculoskeletal range of motion (R. 250, 312) and consistently displayed 4/5 strength in his left arm and hand (R. 298, 303, 349). The ALJ explained why he found the opinions of the state agency medical experts, Dr. Hutchenson and Dr. McGuffin, more persuasive than Dr. Humphries, namely that the experts' opinions were consistent with the totality of the evidence. R. 25. Further, Dr. McClain determined that Dr. Humphries relied on Reginald's self-reports rather than his own medical opinion.[10] In fact, Dr. Humphries agreed that Reginald's left arm and hand showed 4/5 strength in his shoulder, bicep and forearm, no significant muscle wasting, 4/5 grip strength, no hand atrophy, negative results for irritated nerves in his left hand, and adequate fine manipulation. R. 349. Thus, the ALJ sufficiently analyzed the supportability of Dr. Humphries's opinion and provided substantial evidence for why he rejected the doctor's finding.

Substantial evidence also supports the ALJ's decision not to adopt Dr. Gardner's medical opinion that Reginald cannot work in a stressful or competitive work environment and would require frequent absences. The ALJ sufficiently explained his consideration of Dr. Gardner's opinions overall, as required by the regulations. The ALJ found Dr. Gardner's opinion regarding Reginald's mental impairments not persuasive. Specifically, the ALJ determined that Dr. Gardner's conclusions were unsupported by Reginald's mental functional limitations evidence

---

[9] Reginald argues that he was consistent in his description of his left arm impairments to his medical providers and his subjective reports support Dr. Humphries's conclusions. Pl. Br., Dkt. 14 at 10–11. However, the regulations review the consistency of a medical opinion with the other evidence in the record, not the consistency of Reginald's subjective complaints. See 20 C.F.R. §416.920c(c)(2).

[10] Dr. Humphries relied upon information provided by Reginald in giving his opinion, including Reginald's report of pain in his left arm and shoulder, problems swallowing, and, as a result, weight loss of 72 pounds in 12 months. R. 347. In fact, Reginald weighed 198 pounds at his examination with Dr. Humphries on July 25, 2018, 195 pounds on November 20, 2017, and 185 pounds on January 9, 2017. R. 298, 314, 348. Although Dr. Humphries accepts Reginald's self-reported 72 pounds weight loss, there are no medical records of such weight loss due to his injury. R. 241-377.

and relied on Reginald's self-reported symptoms. The ALJ also noted inconsistencies within Dr. Gardner's opinion.[11] R. 24–26. Contrary to Reginald's argument that the ALJ rejected Reginald's mental health evidence consistent with Dr. Gardner's opinion (R. 296, 364–366, 370), the ALJ acknowledged this evidence in his detailed summary of Reginald's RFC. The ALJ noted that Reginald stopped taking his medication for over a year and had never been admitted for inpatient psychiatric treatment or sought treatment for his psychiatric impairments. R. 23–24. The inconsistency between Dr. Gardner's opinion and the evidence in the record is also apparent throughout the treatment records of Dr. Daniels, Dr. Snyder, and Dr. Gregory, which, for example, note that Reginald was alert, oriented, cooperative and pleasant, and that he had a normal mood and affect, intact attention, short term memory and long-term memory, normal thought content and organized thought processes, and appropriate interactions. R. 250, 263, 274, 296, 298, 301, 309, 312, 363, 370, 375. In fact, in August 2019, Reginald denied having any problems with depression or anxiety. R. 373. Both state agency medical consultants, whose opinions the ALJ found consistent with the record and persuasive, found no more than moderate limitations in Reginald's ability to maintain attendance. R. 25–26, 62, 66, 80, 84.

---

[11] Dr. Gardner specifically pointed out that he relied on information provided by Reginald and that Reginald "appeared to be sharing his own self perceptions." R. 355, 358. Reginald reported to Dr. Gardner having lost 15 pounds in the past year due to his problems swallowing, but the previous week, he reported to Dr. Humphries that he lost 72 pounds in the past year due to problems swallowing, and his medical records indicate that he gained 10 pounds during that time. R. 298, 314, 347, 357. Reginald also reported to Dr. Gardner that his last job was at Wendy's but previously reported that his last job was in construction and as a mover. R. 296, 301, 355.

Further, Dr. Gardner's opinion has other internal inconsistencies, including notes that Reginald gets 4-5 hours of sleep per night, but also stating that Reginald goes to sleep at 11:30 p.m. and wakes up at 2:00 a.m. R. 357. Dr. Gardner's notes also report that Reginald was shot in the neck with the bullet penetrating his throat (R. 358), but Dr. Garner's report discusses Reginald having been stabbed in the neck, not shot (R. 357). Dr. Gardner stated that Reginald cannot handle the stress of work and would be absent, but then also stated that he would be able to perform simple and repetitive work tasks, would be able to perform work activities on a consistent basis, and would have no problem completing a normal workday or workweek. R. 359.

Thus, the ALJ acknowledged Dr. Gardner's opinion regarding Reginald's attendance and work limitations, applied the appropriate regulations, and considered the persuasiveness of Dr. Gardner's opinion. The ALJ was not required to defer to Dr. Gardner's opinion, or explain how he considered each of his medical opinions individually.[12] Instead, the RFC assessment lies squarely with the ALJ, not with any medical provider or examiner. 20 C.F.R. §§ 404.1546(c), 416.946(c); see Felton-Miller v. Astrue, 459 F. App'x 226, 230-231 (4th Cir. 2011) ("The ALJ was not required to obtain an expert medical opinion as to [the] RFC.").

The ALJ adequately explained how he evaluated and weighed the medical opinions, and appropriately incorporated the opinions into the RFC determination to the extent they were supportive and consistent with the overall record. When conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the Court defers to the ALJ's decision. Shinaberry v. Saul, 952 F.3d 113, 123 (4th Cir. 2020).

### C. Function-by-Function Analysis

Reginald also asserts that the ALJ erred in determining Reginald's RFC prior to performing a function-by-function analysis. Specifically, Reginald argues that the ALJ failed to assess his limitations regarding attendance and managing work stress. Reginald also asserts that the ALJ incorrectly determined that Dr. Gardner could not rely upon statements made by

---

[12] As the Regulations explain, because of the:

> voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

20 C.F.R. § 404.1520c.

Reginald during the consultative examination. Pl. Br. at 15, Dkt. 14. However, the evidence cited by Reginald was not ignored by the ALJ, and his argument amounts to a disagreement with the ALJ's RFC determination, essentially asking the court to reweigh the evidence.

A function-by-function analysis requires the ALJ to develop an adequate RFC which accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work.  Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. See SSR 96-8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the

15

claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96-8p, and contains sufficient information to allow meaningful review. Unlike the ALJ in Mascio, the ALJ in this case did not fail to consider conflicting medical evidence. Further, the court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a comprehensive analysis of Reginald's medical records, the medical opinions, Reginald's hearing testimony, and the ALJ's conclusions. The ALJ explained how the limitations in the RFC correlate with Reginald's physical and mental impairments.

Specifically, acknowledging Reginald's mental impairments, the ALJ notes that Reginald was cooperative, alert, oriented and in no acute distress despite not taking his prescribed medicine. R. 22–23. Reginald's healthcare providers observed that he had normal mood and affect, normal thought content, organized thought process, was cooperative, friendly, and pleasant. R. 250, 263, 274, 296, 298, 301, 309, 312, 363, 370, 375. Drs. Leizer and McClain found that Reginald could interact with supervisors and coworkers on an infrequent basis and that he was "alright" during his medical visits. R. 66, 85, 357. As a result, the ALJ determined that Reginald's allegation that he is unable to handle the stress of working was inconsistent with and unsupported in the record. R. 26.

Further, the ALJ addressed Reginald's physical impairments in his RFC, noting that Reginald had 4/5 strength in his left upper extremity, no hand atrophy, could feed and dress himself independently, play with his kids, and play video games. R. 23–24. Reginald points to various records that he asserts support a more limited RFC and finding of a disability. The ALJ did not ignore the evidence cited by Reginald; rather, the ALJ provided an extensive medical

history in his decision. The limitations that the ALJ included in the RFC accounted for Reginald's subjective complaints, such as shortness of breath and no usage of the left arm, even though they were not supported by objective medical evidence. R. 24. For example, Reginald had normal speech and no shortness of breath in his clinical reports throughout 2017–2019. R. 21. Overall, substantial evidence supports the RFC, particularly as the ALJ provided a detailed discussion of his consideration of Reginald's subjective complaints, the supportability and consistency of the medical opinions, the objective evidence and Reginald's treatment history.

The role of this court is not to reweigh the evidence, as Reginald urges, or substitute its judgment for the ALJ, but instead determine whether the ALJ's decision is supported by substantial evidence. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Accordingly, I recommend finding that substantial evidence supports the ALJ's RFC determination.

## CONCLUSION

I **RECOMMENDED** entering an order **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the Commissioner, **DENYING** Reginald's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to James P. Jones, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to

the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

                            Entered: February 11, 2022

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge